Page 1

1          IN THE UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF OHIO

3                    EASTERN DIVISION

4               ~~~~~~~~~~~~~~~~~~~~

5     KRYSTAL MOSHOLDER, et al.,

6

7               Plaintiff,

8

9        vs.            Case No. 5:18cv1325

10

11    LOWE'S COMPANIES, INC., et al.,

12

13              Defendants.

14               ~~~~~~~~~~~~~~~~~~~~

15                Deposition of

16                STACIE WILLIAMS

17

18

                 November 25, 2019

19                   1:15 p.m.

20                  Taken at:

                Roetzel & Andress, LPA

21          222 South Main Street, Suite 400

22                  Akron, Ohio

23    Job No. CS3790601

24

25                Ashanti Edwards, RPR

Page 2

1  APPEARANCES:
2
3      On behalf of the Plaintiffs:
4          Pelini, Campbell & Williams, LLC,
5          by
6          CRAIG M. EOFF, ESQ.
7          Bretton Commons
8          8040 Cleveland Avenue NW, Suite 400
9          North Canton, Ohio 44720
10         Ceoff@pelini-law.com
11
12     On behalf of The Defendant, Lowe's
13      Companies, Inc.:
14         Roetzel & Andress, LPA, by
15         NICHOLAS P. RESETAR, ESQ.
16         222 South Main Street, Suite 400
17         Akron, Ohio 44308
18         (330) 849-6791
19         Nresetar@ralaw.com
20             ~ ~ ~ ~ ~
21
22
23
24
25

Page 3

1              TRANSCRIPT INDEX
2
3  APPEARANCES                    2
4
5  INDEX OF EXHIBITS              4
6
7  EXAMINATION OF STACIE WILLIAMS
8  BY MR. EOFF                    5
9
10 REPORTER'S CERTIFICATE         56
11
12 EXHIBIT CUSTODY
13 EXHIBITS RETAINED BY THE COURT REPORTER
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1              INDEX OF EXHIBITS
2  NUMBER        DESCRIPTION        MARKED
3  Exhibit 1   Statement          25
4  Exhibit 2   Photo              37
5  Exhibit 3   Lowe's pet policy     39
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1          STACIE WILLIAMS, of lawful age,
2  called for examination, as provided by the
3  Federal Rules of Civil Procedure, being by me
4  first duly sworn, as hereinafter certified,
5  deposed and said as follows:
6          EXAMINATION OF STACIE WILLIAMS
7  BY MR. EOFF:
8      Q.   So, Ms. Williams, we are here today
9  for your deposition pursuant to a subpoena that
10 you received from my office.  You do recall
11 receiving that subpoena?
12     A.   Yes.
13     Q.   Okay.  And that is the reason you
14 came here today?
15     A.   Yes.
16     Q.   Okay.  We're here on the matter of
17 Krystal Mosholder, et al. versus Lowe's
18 Companies, Inc., et al., pending before the
19 United States District Court for the Northern
20 District of Ohio, Eastern Division, case number
21 5:18-CV-1325.  Just for the record, if you
22 don't mind, Ms. Williams, can you please state
23 your full name and spell your last name,
24 please?
25     A.   Yes.  Stacie Williams,

Page 6

1  W-I-L-L-I-A-M-S.
2      Q.    And you have a unique spelling for
3  your first name.
4      A.    Yes.
5      Q.    Why don't we go ahead and get that
6  on the record as well.
7      A.    S-T-A-C-I-E.
8      Q.    Okay.  Have you ever been deposed
9  before?
10     A.    (Witness shakes head.)
11     Q.    Okay.  All right.  So this is going
12  -- I'll go over --
13          MR. RESETAR:  Say no.  She nodded
14  her head.
15     A.    Sorry.
16     Q.    That's one of the things we're
17  going to cover.
18     A.    Okay.
19     Q.    So we'll go over a few things so
20  that I can help you get through this and you
21  and I can work together here a little bit.  One
22  of the first things is, as you can see, our
23  court reporter is trying to take down
24  everything that you and I say.
25     A.    Okay.

Page 7

1      Q.    So that means your responses need
2  to be verbal in nature.  She can't take down
3  nods of the head and gestures and things of
4  that nature.
5      A.    Okay.
6      Q.    I'm the worst at this.  I'll do the
7  best I can to let you finish answering my
8  question before I ask the next one.  Try to let
9  me finish asking my question before you answer
10  it so that you and I are not talking at the
11  same time.  Because that gets very, very
12  difficult for the court reporter to take down
13  when we're both talking at once.
14     A.    Okay.
15     Q.    If you need a break, let me know.
16  I don't think you're going to be here very
17  long.  This is going to probably be very quick.
18  But in the event that you do need a break, let
19  me know.  I'm happy to accommodate that.  The
20  only thing I'd ask is that if, in fact, I've
21  got a question pending, that you answer that
22  question before we take a break.
23     A.    Okay.
24     Q.    Okay.  Do you have any questions
25  about the procedure here today and what's going

Page 8

1  to go on?
2      A.    No.
3      Q.    Okay.  All right.  I'm going to go
4  ahead and jump into this.  Stacie, what's your
5  current address?
6      A.    It's 310 East Highland Avenue,
7  Ravenna, Ohio 44266.
8      Q.    How long have you lived at that
9  address?
10     A.    11 years.
11     Q.    Okay.  Are you currently employed?
12     A.    Yes.
13     Q.    Where do you work?
14     A.    University Hospitals Portage
15  Medical Center.
16     Q.    And what do you do for them?
17     A.    I'm a nursing assistant.
18     Q.    Prior to working for University
19  Hospitals, where did you work?
20     A.    Lowe's in Brimfield.
21     Q.    So you mentioned Lowe's in
22  Brimfield, which is, obviously, the location of
23  the store that brings us together today for
24  this deposition.  How long did you work at
25  Lowe's?

Page 9

1      A.    Close to two years.
2      Q.    Were you at that specific location
3  for two years?
4      A.    Yes.
5      Q.    Okay.  Have you ever worked for any
6  other Lowe's location?
7      A.    No.
8      Q.    Okay.  Where did you work prior to
9  your time at Lowe's?
10     A.    I did home health care for adults
11  with disabilities.
12     Q.    How long did you do that?
13     A.    For quite a few years.  It was
14  different companies.  Because it was in-home, I
15  went with my clients when they switched
16  companies.
17     Q.    Okay.  Stacie, did you graduate
18  from high school?
19     A.    I did.
20     Q.    Where did you graduate from?
21     A.    Ravenna High School.
22     Q.    And when was that?
23     A.    2005.
24     Q.    Do you have any post-high school
25  education or training?

3 (Pages 6 - 9)

Page 10

1    A.   Not so much.  I did like insurance
2  sales, so I did go to school for that.  But it
3  was just like a 40-hour course.
4    Q.   Okay.
5    A.   No college courses.
6    Q.   Was it like a certificate program
7  of some sort?
8    A.   Yeah.
9    Q.   Your current position as a nursing
10  assistant, did that require any educational
11  requirements?
12    A.   It was all in-house training.
13    Q.   Okay.  So let's go back to the --
14  your time with Lowe's.  I was looking -- give
15  me one second.
16    A.   Sure.
17    Q.   I know I have this.  Okay.  So the
18  Lowe's location that we were roughly
19  referencing a little bit ago, you referred to
20  it as the Brimfield Lowe's, correct?
21    A.   Yes.
22    Q.   Okay.  We'll define it and we'll
23  continue to call it the Brimfield Lowe's, just
24  for purposes of our deposition today, if that
25  makes it easier for you.

Page 11

1    A.   Okay.
2    Q.   The address for the Lowe's store
3  that we're talking about is 218 Nicholas Way,
4  Kent, Ohio; is that correct?
5    A.   Correct.
6    Q.   Okay.  So let's go back to your
7  time working at the Brimfield Lowe's.  Do you
8  recall when you first started working there?
9    A.   I believe it was February -- oh,
10  man.  I've been at the hospital for a year.
11  Maybe '16.  2016.
12    Q.   Okay.
13    A.   I cannot remember dates.
14    Q.   That's okay.  That's okay.  When
15  you were first hired on at Lowe's, what was the
16  job that you were hired to do?
17    A.   Cashier.
18    Q.   Okay.  When you left Lowe's -- you
19  said you worked there for about two years, if I
20  recall correctly?
21    A.   Correct.
22    Q.   When you left Lowe's were you still
23  working as a cashier?
24    A.   No.
25    Q.   What job were you in at that time?

Page 12

1    A.   ProService sales associate.
2    Q.   Okay.  What does a ProService sales
3  associate do?
4    A.   We work with contractors to give
5  them the best deal possible on bundle packages.
6    Q.   So bundle packages -- so a
7  contractor has got a job and they come in with,
8  here's everything we're going to need to do
9  this job and you figure out what Lowe's is
10  going to charge them for the supplies and
11  materials that they need for that particular
12  job?
13    A.   Yes.  And then we also have all the
14  business accounts that we handle and we contact
15  them every so often to see how their account
16  was doing, what they needed from us.  So pretty
17  much the contractors.
18    Q.   So there's kind of a customer
19  relationship building aspect to it as well.
20  You are partially charged with staying in touch
21  with these customers and making sure that
22  Lowe's is meeting their needs?
23    A.   Yes.
24    Q.   Okay.  In between being a cashier
25  and being in that position, did you hold any

Page 13

1  other positions for Lowe's?
2    A.   No.
3    Q.   Okay.  All right.  So let's go back
4  to when you first started working for Lowe's
5  and you became a cashier.  What type of
6  training did you receive to become a cashier?
7    A.   We did like on-the-floor training,
8  then we had to take classes on the computer
9  for, what would you do in this situation, what
10  would you do in that situation, or if people
11  were stealing, if there was a problem with
12  other employees and what we would do, who would
13  we report it to.
14    Q.   Okay.  So you received training on
15  not only how to run that cash register, but to
16  be aware of theft or other potential issues and
17  I would assume how to report those issues?
18    A.   Correct.
19    Q.   Okay.
20    A.   I was also trained on the front end
21  as well to be -- to work at the customer
22  service desk, I guess, to do returns, those
23  sorts of things, but that was just as a fill-in
24  basis.  It was never a position that I held.
25    Q.   So when you get trained to do the

Page 14

1 front end -- you're referring to the -- I've
2 been in a Lowe's.  Up front there's that
3 customer service desk that's kind of off to the
4 side.  That's what you're referring to as the
5 front end, is that customer service area?
6     A.   Correct.
7     Q.   And the additional responsibilities
8 in the customer service department versus the
9 cashier is you would also handle returns?
10     A.   Correct.
11     Q.   I would assume you would field more
12 questions from customers?
13     A.   Correct.  Do credit card
14 applications, credit card payments, those sorts
15 of things.
16     Q.   Did you have any responsibilities
17 in terms of management over other employees?
18     A.   No.
19     Q.   Okay.  Do cashiers have any
20 management authority whatsoever?
21     A.   No.
22     Q.   Does anyone in that customer
23 service department have management authority?
24     A.   Yes.  There was a head cashier that
25 oversees the other cashiers during that shift.

Page 15

1     Q.   Okay.  And that includes those
2 customer service folks?
3     A.   Correct.
4     Q.   You were never the head cashier?
5     A.   No.
6     Q.   Okay.  What about your sales
7 associate position?  Did you have oversight
8 authority over other employees?
9     A.   No.
10     Q.   Okay.  The training that you said
11 you received online, was it strictly related to
12 the work as a cashier?
13     A.   Yes.
14     Q.   Okay.  What about your sales
15 associate position?  Did you receive new
16 training at that time?
17     A.   No.  It was just on-floor training.
18 It was more based on what our computer -- what
19 we had on the computer.  So for like our bid
20 room and handling the contracts.  I did have to
21 take one course on privacy for the contractors'
22 accounts.
23     Q.   Okay.  When you mentioned you took
24 a course on privacy, I'm assuming this is also
25 something that was done on some type of online

Page 16

1 portal?
2     A.   Yes.  All Lowe's training, besides
3 like the on-hand training, is all done on their
4 computers.
5     Q.   Okay.  Was there some type of name
6 that was given to that portal or software of
7 any kind?
8     A.   I don't remember, honestly.
9     Q.   Okay.  You would access it while
10 you were at the store?
11     A.   Yes.  It couldn't be done outside
12 the store.
13     Q.   Okay.  You mentioned privacy.  I
14 don't want to -- I don't want to put words in
15 your mouth or assume anything.  You were
16 suggesting you were being trained on privacy
17 policies of Lowe's?
18     A.   Correct.
19     Q.   Okay.
20     A.   Yes.
21     Q.   Give me some examples of any other
22 types of Lowe's policies that you might have
23 been trained on.
24     A.   Like with that position or --
25     Q.   With either of the positions.

Page 17

1     A.   I mean, we went through like theft,
2 what to do if, you know, somebody is stealing,
3 who to report it to.  I mean, privacy for our
4 clients, honesty, like making sure you check
5 everything, checking receipts, those sorts of
6 things.  Nothing extenuous.  Pretty much
7 anything with sales.
8     Q.   Okay.  Were you ever given any
9 training on the pet policy?
10     A.   No.
11     Q.   Do you know what the pet policy is?
12     A.   They're allowed -- any pet's
13 allowed in the store as long as it's leashed
14 and friendly.
15     Q.   Okay.  So when we say any pet, I
16 mean, obviously, people can bring a dog into
17 the store, correct?
18     A.   Correct.
19     Q.   Okay.  But would you stop me if I
20 tried to bring in a horse?
21     A.   I mean, the policy is if it's
22 leashed and with its owner --
23     Q.   Okay.  Okay.  So you weren't given
24 any training that said, these are the extreme
25 examples, we are not okay with someone bringing

5 (Pages 14 - 17)

Page 18

1 a horse in?  It was just any pet?
2    A.   Yes.
3    Q.   Okay.  All right.  Did you receive
4 any direct training though about the policy
5 itself?  Was there like a seminar or some type
6 of a meeting where this was explained to you?
7    A.   No.
8    Q.   How did you find out what the
9 policy was?
10   A.   Through management.  And there's a
11 big sign on the door that says we're pet
12 friendly.
13   Q.   There is a big sign on the doors.
14 I'm going to ask you about that in a minute.
15 You're getting ahead of me.  Okay.  So when you
16 said through management, was that something
17 that management came to each employee or came
18 to you -- we'll leave it to you because you
19 really can't tell me what happened with other
20 folks, but did management come to you and say,
21 hey, Stacie, today I want to talk to you about
22 what our pet policy is?
23   A.   No.  There might have been
24 something like in the training, but if it was
25 it was very brief.  I don't remember.  It's

Page 19

1 been years.  And it was a lot of computer work.
2    Q.   Okay.  Fair enough.
3    A.   But that was one of the reasons I
4 wanted to work there, because people bring
5 their animals.
6    Q.   Do you recall ever having any
7 conversation with any management personnel
8 about the pet policy at Lowe's?
9    A.   Not that I can recall.
10   Q.   Do you recall ever having any
11 conversation with any of your fellow employees
12 about the pet policy at Lowe's?
13   A.   Yeah.  We all talked about it.
14   Q.   What types of things would you guys
15 discuss?
16   A.   Just different animals and -- they
17 would always bring them in.  So we had birds,
18 we had dogs, we had all kinds of stuff come in.
19 A baby pig.
20   Q.   People bring birds into Lowe's?
21   A.   Um-hmm.  I have pictures of one
22 sitting on my arm.
23   Q.   Okay.  Okay.  So let me ask you,
24 Stacie, just off-the-cuff, do you -- are you
25 familiar with a woman named Krystal Mosholder?

Page 20

1    A.   Yes.
2    Q.   Okay.  How do you know
3 Mrs. Mosholder?
4    A.   She was in there every day.
5    Q.   Okay.  So you are familiar with her
6 as a result of the fact that you worked at the
7 Brimfield Lowe's and Mrs. Mosholder was a
8 customer at Lowe's?
9    A.   Correct.
10   Q.   Okay.  Would you talk to her when
11 she was in the store?
12   A.   When she was in line.  I talked to
13 everybody though.
14   Q.   When she was checking out through
15 your cash register?
16   A.   Um-hmm.  She always checked out in
17 ProService.  We had two regular registers and
18 then we had our ProService register.
19   Q.   Right.
20   A.   So she would just come through
21 whichever line was shorter.  If the line got
22 backed up I'd get on a register and help.  And
23 she would come through.  There was a few times
24 I helped her find stuff in the store.
25   Q.   Okay.

Page 21

1    MR. EOFF:  Off the record for a
2 second.
3    (Off the record.)
4 BY MR. EOFF:
5    Q.   So do you recall the date of March
6 15th, 2018?
7    A.   Um-hmm.  Yes.
8    Q.   Do you recall Mrs. Mosholder being
9 in the Lowe's Brimfield location on that date?
10   A.   Correct.
11   Q.   Can you describe to me what, if
12 anything, you saw that day that would have been
13 eventful about Mrs. Mosholder's presence at
14 that Lowe's and anything that you would have
15 witnessed?
16   A.   I mean, we were both in the spray
17 paint aisle.  There was a guy that came in
18 weekly with his dog and I always had treats in
19 my pocket.  So I was giving him a treat.  I was
20 down there and she was messing with the spray
21 paint and picking out a color.  She turned
22 around and she stuck her hand out and she said,
23 oh, do you smell my puppies.  And the dog kind
24 of like -- not nipped, but kind of like played
25 with her.  And she pulled her hand away and she

Page 22

1 goes, must smell mine and she walked away.  And
2 that was it.
3    Q.   Okay.  So you mentioned the
4 gentleman that was with the dog.
5    A.   Um-hmm.
6    Q.   Let's start there.  Sounded to me,
7 from what you said, that he was at least known
8 to you as a customer of Lowe's, that he was
9 there somewhat frequently, correct?
10    A.   Yeah.  I don't know his name.  I
11 mean, I remember the dog over the person, so --
12    Q.   Okay.  But you've seen that dog in
13 the store before?
14    A.   Correct.
15    Q.   Okay.  Describe the dog to me.
16    A.   He was black and white, really
17 playful.  I mean, medium sized.  I can't say
18 large.  Mine are huge, so --
19    Q.   Okay.
20    A.   -- a lot smaller than mine.  Maybe
21 50 to 60 pounds.  Always on a leash, always
22 happy-go-lucky in the store, walks up to
23 everybody.
24    Q.   If you had to guess, how many times
25 do you think you've seen this dog in the

Page 23

1 Brimfield location of Lowe's?
2    A.   If I had to guess, probably at
3 least five or six.
4    Q.   At any time have you ever seen that
5 dog be angry or aggressive in any way?
6    A.   Not in any way.
7    Q.   You always saw the dog be playful?
8    A.   Yeah.  I -- I mean, there were kids
9 that would walk up and, can I pet the dog.  My
10 kids being one of them, walked up and pet the
11 dog on different occasions.
12    Q.   Okay.  The gentleman that the dog
13 was with, was that always the same person that
14 dog was with when he came into the store?
15    A.   Yes.
16    Q.   Okay.  You don't know that man's
17 name?
18    A.   No.  I just know him from walking
19 through the store.
20    Q.   He would certainly be someone
21 though that you had seen in the store before
22 and talked to before?
23    A.   Yeah.  Just about -- I mean, not
24 really about projects or anything.  Just about
25 animals.

Page 24

1    Q.   So on March 15th, 2018, you said
2 you were in the spray paint aisle?
3    A.   Um-hmm.
4    Q.   Was the dog and this gentleman that
5 the dog was with in the spray paint aisle
6 before you came into the spray paint aisle?
7    A.   Yeah.  I went into the aisle to pet
8 the dog.
9    Q.   Okay.  So you went up to pet the
10 dog?
11    A.   Um-hmm.
12    Q.   You were talking to the dog's
13 owner?
14    A.   Yes.
15    Q.   Do you recall what you guys might
16 have been talking about?
17    A.   Just the dog.
18    Q.   Okay.
19    A.   It was never really about projects.
20 It was just about the dog.
21    Q.   He wasn't asking any questions
22 about spray paint?
23    A.   No.
24    Q.   Or, you know, where he might be
25 able to find a, you know, toilet handle?

Page 25

1    A.   No.
2    Q.   Okay.  Were the two of you and the
3 dog in the spray paint aisle prior to
4 Mrs. Mosholder coming into the spray paint
5 aisle?
6    A.   I believe so.  Because I know she
7 walked up to us when she was looking.
8    Q.   Okay.
9    A.   But I don't know if she could have
10 been at the other end.  I'm not sure.
11    Q.   Okay.
12    A.   But she definitely walked toward
13 us.
14    Q.   Okay.  I'm going to hand you what
15 we're going to have marked as Exhibit 1 to your
16 deposition.
17    A.   Okay.
18        - - - - -
19        (Thereupon, Deposition Exhibit 1,
20        statement, was marked for purposes
21        of identification.)
22        - - - - -
23    Q.   So Stacie, here is deposition
24 Exhibit 1.  I want you to read that real quick
25 and then when you've had a chance to read it,

7 (Pages 22 - 25)

Page 26

1 look up and I'll start asking my questions.
2    A.   Okay.
3    Q.   Okay.  Ready?
4    A.   Um-hmm.
5    Q.   Okay.  So correct me if I'm wrong,
6 but I believe this to be -- you'll see your
7 signature on this Exhibit 1, correct?
8    A.   Correct.
9    Q.   This is a statement that you
10 provided to Lowe's on March 15th, 2018 about
11 the incident that we're discussing today,
12 correct?
13    A.   Correct.
14    Q.   So when you were discussing with me
15 earlier you and the gentleman with the dog and
16 the dog were in the spray paint aisle,
17 Mrs. Mosholder came into the spray paint aisle,
18 she walked up to the dog, that incident is the
19 same incident that you are describing in this
20 statement that's Exhibit 1, correct?
21    A.   Correct.
22    Q.   Okay.  Now, you said in the middle
23 of this and in your testimony you said as well
24 that the dog went to smell the lady, who I'm
25 assuming is Mrs. Mosholder?

Page 27

1    A.   Yes.
2    Q.   And that the owner -- it says in
3 your statement that the owner pulled him back,
4 meaning the dog, and told the dog, not everyone
5 wants to pet you.  Do you see that?
6    A.   Yes.
7    Q.   Okay.  And then it says she -- I'm
8 assuming again we're talking about Mrs.
9 Mosholder?
10    A.   Yes.
11    Q.   -- then turned around and put her
12 hand right up to the dog's mouth and said, you
13 probably smell my dog and was moving her
14 fingers.  Is that an accurate reading of that?
15    A.   Yes.
16    Q.   Okay.  The very next sentence says,
17 the dog in a playing fashion went to lick her
18 hand and may have nipped her, but not hard
19 enough to do any damage.  Do you see that?
20    A.   Um-hmm.
21    Q.   Okay.
22    A.   Yes.
23    Q.   You did not see the dog bite
24 Mrs. Mosholder?
25    A.   No.

Page 28

1    Q.   Okay.  You believe, from what
2 you've stated here, that the only part of
3 Mrs. Mosholder's body that the dog made contact
4 with, that you could see, was her hand?
5    A.   Correct.  Her fingers.  Not even
6 really her hand.
7    Q.   So if she got bit on the upper leg
8 or hip area, you did not see that take place?
9    A.   Oh, no.  No.
10    Q.   Okay.  Now, it also says later here
11 in the statement, I talked to the owner for a
12 few more minutes and walked away to go to the
13 morning meeting.
14    A.   Correct.
15    Q.   Okay.  Mrs. Mosholder, was she
16 there the entire time you continued your
17 conversation?
18    A.   No.  She walked off.
19    Q.   She walked off?
20    A.   Toward the back of the store.
21    Q.   So Mrs. Mosholder walks away, the
22 incident, if you will, is over and you've
23 continued to talk to the dog owner?
24    A.   Yeah.  For a couple minutes.
25    Q.   Okay.  Did the dog owner say

Page 29

1 anything or react in any way that gave you an
2 indication that he may have seen the dog bite
3 Mrs. Mosholder?
4    A.   No.
5    Q.   Okay.  Was there anyone else in the
6 aisle, the spray paint aisle, at that time?
7    A.   Not that I can recall.  Not with us
8 anyways.  I mean, it's a longer aisle, but not
9 with us.
10    Q.   Okay.  Kind of describe that spray
11 paint aisle a little bit.  I've been in there,
12 so I have a visual at least in my mind.  But
13 were you at the end of one of the aisles?  Were
14 you in the middle?  Where about in the aisle
15 were you?
16    A.   There's the spray paint aisle.
17 Then, there's like the paint center and then
18 all the way down there's like the blinds and
19 stuff.  It's toward the end, towards the middle
20 of the store.  The end of, technically, the
21 spray paint aisle, but toward like the middle
22 aisle of the store.
23    Q.   Okay.  So you were -- there would
24 have been a larger cross aisle or a corridor
25 that would be going past there, correct?

8 (Pages 26 - 29)

Page 30

1     A.   Correct.
2     Q.   Do you recall whether or not there
3  were any other Lowe's employees or customers in
4  that area who might have been able to see what
5  was taking place there?
6     A.   No.  There was people at the
7  opposite end, toward the paint center, because
8  that's where we did our morning meetings and
9  that's where I was headed to.
10    Q.   And you went to the morning meeting
11  then after that, correct?
12    A.   Yes.  And the dog walked through
13  our morning meeting --
14    Q.   Okay.
15    A.   -- with the owner.
16    Q.   Did you -- so was there any
17  conversation about the dog at morning meeting?
18    A.   No.  Everybody was petting him
19  while he was walking through.  I'm sorry.  I
20  didn't --
21    Q.   You're fine.  That's fine.  You
22  didn't get the impression -- did anyone say
23  anything -- I'm just trying to identify whether
24  or not there's other people that I need to talk
25  to.  Did anyone in that morning meeting, that

Page 31

1  would have been at the end of the aisle up
2  there at that time, indicate or say anything
3  that would lead you to believe that they saw
4  anything between the dog and Mrs. Mosholder?
5     A.   No.
6     Q.   So as you sit here today, you don't
7  think anybody but yourself, potentially the dog
8  owner and Mrs. Mosholder would have been close
9  enough to have seen anything that would be able
10  to explain what happened between Mrs. Mosholder
11  and the dog?
12    A.   Correct.
13    Q.   Okay.  Okay.
14    A.   Like I said, he did walk through
15  like our morning meeting.  Like three or four
16  of the employees -- the guy stopped so they
17  could pet the dog, too.
18    Q.   Okay.
19    A.   And I didn't even hear anything
20  about a supposed bite until almost the end of
21  my shift.
22    Q.   Okay.  How did it come up -- or at
23  what point in time of the day -- what took
24  place that led you to write this statement
25  that's Exhibit 1?

Page 32

1     A.   It was later when one of the
2  managers came down and talked to us about it,
3  said that her husband had called in and said
4  that she was bit pretty good and that she got
5  home and when she took her pants off there was
6  blood.  And he didn't know that I was down
7  there either until I said, I was in the aisle
8  when it happened.  So he was like, can you
9  write something up, like what happened.  He
10  asked me verbally and then asked me to write up
11  a statement as well.
12    Q.   Who is that person?
13    A.   Chad.
14    Q.   What's Chad's last name?
15    A.   I don't remember.  It starts with
16  an F.
17    Q.   Okay.  Fair enough.  Fair enough.
18  And Chad's position was what?
19    A.   He is an ASM.  It's like an
20  assistant store manager.
21    Q.   Okay.  So assistant store manager.
22  To the best of your knowledge, what is the
23  assistant store manager's responsibilities?
24    A.   They all have their own departments
25  that they oversee.  So they oversee all the

Page 33

1  employees in those departments.
2     Q.   What department was Chad
3  overseeing?
4     A.   I'm sorry.  He wasn't my manager,
5  so he wasn't for ProService.
6     Q.   You don't know what he actually
7  was?
8     A.   No.  He was like right under the
9  store manager.
10    Q.   So Chad comes to you.  What did
11  Chad say to you when he came to you?
12    A.   Well, he just came down and asked
13  us, because she had checked out down there --
14    Q.   Yes.
15    A.   -- if she had mentioned anything,
16  said anything.  And he brought up the dog.  I
17  was like, well, I was in the aisle with the
18  spray paint when she walked up to the dog.
19    Q.   Okay.  So that connects the dots
20  for me.  So that's how he found out that you
21  may have been there and were a potential
22  witness?
23    A.   Correct.
24    Q.   Okay.  There wasn't some type of
25  store meeting to find out who knew anything?

9 (Pages 30 - 33)

Page 34

1    A.   Not that I know of.  Not that I was
2  involved in anyway.
3    Q.   Okay.  To your knowledge, did
4  anyone else that was a Lowe's employee come
5  forward and indicate that they felt that they
6  had seen something or had knowledge about the
7  incident with Mrs. Mosholder and the dog in
8  question?
9    A.   Not to my knowledge.
10   Q.   Okay.  Did you ever talk to Chad
11 after you provided the statement?
12   A.   About this?  No.  Not until I was
13 in the store recently and he said that I might
14 get contacted about it.
15   Q.   Okay.  I think that -- so have you
16 ever spoken with anyone else concerning this
17 incident?
18   A.   No.
19   Q.   Have you talked to Mr. Resetar?
20   A.   Yes.
21   Q.   Okay.
22   A.   And our store manager, Cameron.
23   Q.   Okay.  Do you know Cameron's last
24 name?
25   A.   Childers.

Page 35

1    Q.   What did you discuss with
2  Mr. Childers?
3    A.   He brought it up that I might be
4  getting a phone call and asked, you know, if it
5  was okay to provide my information and I said
6  absolutely.
7    Q.   Okay.
8    A.   Because I'm not an employee there
9  anymore.
10   Q.   Okay.  By the way, I want to tell
11 you I do appreciate you showing up here today.
12 I don't want you to think anything other than
13 that.
14   A.   Oh, no.  Absolutely.
15   Q.   So did Mr. Childers and you discuss
16 the incident at all?
17   A.   No.
18   Q.   Okay.  You didn't talk about what
19 happened and he didn't try to discuss with you
20 the facts of what you saw?
21   A.   No.  I talked to Chad about it.
22   Q.   When it happened?
23   A.   Yes.
24   Q.   Okay.  What did you and Mr. Resetar
25 talk about?

Page 36

1    A.   Just that -- he asked if I would
2  come in and give testimony on what I did
3  witness to and I told him that I worked nights,
4  so I would have to, you know, make
5  arrangements, but that would be fine.
6    Q.   Sure.  Did you review anything
7  prior to your deposition here today?
8    A.   No.
9    Q.   To prepare for today?
10   A.   No.  I mean, he went over kind of
11 like how it was going to be, that it's not
12 like a court room and it would just be, you
13 know, like this.
14   Q.   Sure.  Did you -- did Mr. Resetar
15 provide you anything to review prior to your
16 deposition today?
17   A.   No.  He asked me if I knew what I
18 wrote and I knew what I wrote, so --
19   Q.   Okay.  So you remembered the
20 statement?
21   A.   Yeah.  I remember it.  I mean, it
22 -- it was a dog, so --
23   Q.   Sure.  You didn't review a copy of
24 your statement prior to coming in here today?
25   A.   No.

Page 37

1    Q.   Okay.  Fair enough.  Okay.  So we
2  were talking earlier -- we were talking a
3  little bit about the sign on the door.
4    A.   Um-hmm.
5    Q.   Okay.  So we're going to mark
6  Exhibit 2.
7          - - - - -
8          (Thereupon, Deposition Exhibit 2,
9          photo, was marked for purposes of
10         identification.)
11         - - - - -
12   Q.   Okay.  So we've got deposition
13 Exhibit 2.  I'm going to hand that to you.
14   A.   Sure.
15   Q.   Do you recognize what that is a
16 picture of?
17   A.   Yes.
18   Q.   What is that?
19   A.   It's saying that they're dog
20 friendly, animal friendly.
21   Q.   More specifically, is that a
22 picture of the front door, the entrance to a
23 Lowe's store?
24   A.   To a Lowe's store, yes.
25   Q.   Can you tell whether or not it is a

10 (Pages 34 - 37)

Page 38

1 picture of the door going into the Brimfield
2 Lowe's?
3      A.   No.  They all look the same.
4      Q.   That was going to be my next
5 question.  Okay.  So the -- you were
6 specifically talking a moment ago about the
7 language.  You'll see on this picture there's a
8 red box that is essentially highlighting a blue
9 sign.  It probably looks more like a sticker on
10 the window to the door; is that right?
11      A.   Correct.
12      Q.   Okay.  And that blue sticker or
13 sign discusses on some level Lowe's policy
14 allowing people to bring pets into the store,
15 correct?
16      A.   I've never read it, to be honest.
17      Q.   Okay.  Okay.
18      A.   But I would imagine.
19      Q.   That was going to be my next
20 question.  Do you know what that says?
21      A.   No.
22      Q.   Because, unfortunately, it's a
23 little small for any of us to read.
24      A.   Yes.
25      Q.   But your suspicion is that that's a

Page 39

1 sign that states to customers that they're
2 allowed to bring in pets to the store?
3      A.   Correct.
4      Q.   You are also expecting it probably
5 says that they have to be leashed, correct?
6      A.   Correct.
7      Q.   And what else do you think it
8 likely says?
9      A.   The other things is we ask the
10 owners to clean up after them, you know, if
11 they use the bathroom.  We'll provide you with
12 stuff, but -- I would be lying if I said I
13 never cleaned up after somebody else's animal
14 in the store.
15      Q.   Yeah.
16      A.   It happens.
17      Q.   I'm sure.
18           - - - - -
19           (Thereupon, Deposition Exhibit 3,
20           Lowe's pet policy, was marked for
21           purposes of identification.)
22           - - - - -
23      Q.   All right.  Okay.  Stacie, I'm
24 handing you what's been marked -- by the way, I
25 hope you don't care that I'm calling you Stacie

Page 40

1 as opposed to Ms. Williams.  I apologize if --
2      A.   No.  That's fine.
3      Q.   I should have been more formal.
4 I'm handing you what we've marked as Deposition
5 Exhibit 3.  Have you ever seen that document
6 before?
7      A.   I'm not sure, honestly.  I would
8 say probably.  Like I said, all that training
9 was like a ton of computer stuff within like a
10 two-day window.
11      Q.   Okay.  Fair enough.  I'll represent
12 to you that this has been provided to me by
13 Lowe's counsel as Lowe's pet policy.
14      A.   Okay.
15           MR. EOFF:  Mr. Resetar, do you want
16 to state something for the record?
17           MR. RESETAR:  Only that this
18 document is designated as confidential pursuant
19 to the stipulated protective order that's been
20 entered by the court in this matter.  Also,
21 that that's been designated as confidential and
22 proprietary by Lowe's themselves, as evidenced
23 by the designation on the bottom above the
24 Bates stamp.  Counsel and I discussed that if
25 this deposition will be filed we will discuss

Page 41

1 how to handle this confidential document prior
2 to filing.
3           MR. EOFF:  And that is an accurate
4 representation of the conversation that counsel
5 and I had.
6      Q.   So Stacie, going back to this real
7 quick.  And I think you've somewhat already
8 answered my question.  You don't recall
9 specifically seeing this document in any of
10 your training?
11      A.   Correct.  I mean, it could have
12 been there.  I'm honestly not sure.
13      Q.   Okay.  So I'll ask an unfair
14 question, but I'm going to ask it anyway.  So
15 you can't tell me whether or not the blue
16 sticker/sign that's highlighted by the red box
17 on Exhibit 2 is a recitation of what's found in
18 Exhibit 3?
19      A.   Correct.
20      Q.   Okay.  So if we go down to the
21 middle of the page, do you see where it says
22 scope?
23      A.   Yes.
24      Q.   Okay.  So the very first thing it
25 says in Exhibit 3 is, service animals and pets

11 (Pages 38 - 41)

Page 42

1 are allowed in all Lowe's stores. You believe
2 that to be accurate? You saw that with your
3 own two eyes, correct?
4 A. Correct.
5 Q. Okay. Service animal requirements
6 are defined and governed by the ADA, it says in
7 the next bullet point. Then, it goes on to
8 say, additional information on service animals
9 in places of business is also available on the
10 ADA website. Then it says, pet requirements
11 are defined below and enforced, as needed, by
12 Lowe's store employees. Do you see that
13 language?
14 A. Yes.
15 Q. So when they talk about Lowe's
16 store employees enforcing the pet policy
17 requirements, what, if anything, were you told
18 about enforcing the pet policy guidelines?
19 A. If they're not on a leash or being
20 held -- they have to be leashed. But we can
21 kindly ask them to take them out of the store.
22 If they seem aggressive, we can ask them to go
23 out of the store.
24 Q. So in terms of, if they seem
25 aggressive, what would you be looking for?

Page 43

1 A. I mean, just showing any kind of
2 aggression. Growling, nipping, you know, just
3 the way their posture is. Those sorts of
4 things.
5 Q. So it's kind of the normal
6 sensibilities of what you might expect if you
7 see a dog doing something -- you're just using
8 your common sense to determine that that dog
9 might be aggressive or acting in a dangerous
10 way?
11 A. Correct.
12 Q. Were you trained to have a manager
13 address this or were you trained to walk
14 directly up to that customer and tell them that
15 they needed to take the dog out of the store?
16 A. I think it depends on what they
17 were comfortable with. Some people aren't
18 comfortable walking up and asking. But
19 managers were always available to do that.
20 Q. You certainly had the right or the
21 ability, as a Lowe's employee, to address it
22 with the customer directly if you felt you
23 needed to?
24 A. Yes.
25 Q. Okay.

Page 44

1 A. Because if there is -- if I see
2 that there's somebody bringing a vicious dog in
3 and I don't have time for a manager to get
4 there and the dog bites somebody in the
5 meantime, I could have prevented that by asking
6 them to take their dog back outside.
7 Q. Can you recall a time that you ever
8 had to do that?
9 A. No.
10 Q. Do you recall ever seeing any other
11 employee of Lowe's, management or otherwise,
12 ever having to do that?
13 A. No.
14 Q. Did you ever see a dog or any other
15 animal that wasn't appropriately leashed in the
16 store?
17 A. No.
18 Q. Okay.
19 A. People are pretty good about it.
20 And it was usually the same people over and
21 over again that brought their animals.
22 Q. Sure. And there's also that spirit
23 of -- I know that when I go into certain stores
24 that I frequent, those folks, they think they
25 know me, they're saying hi, we chat. They

Page 45

1 don't even know my name, but they know me.
2 It's kind of like that as well, I would
3 imagine, right?
4 A. Correct.
5 Q. Okay. So if we go down to the
6 section of this Exhibit 3 that says policy, do
7 you see that first bullet point where it says,
8 the owner or handler must always have direct
9 physical control of the animal by one or both
10 of the following methods. The animal must be,
11 one, heeling, walking calmly beside the owner
12 or handler, two, harnessed, leashed or carried?
13 A. Correct.
14 Q. So in this particular instance, on
15 March 15th of 2018, the dog that is in question
16 in the incident with Mrs. Mosholder, he was
17 leashed; is that correct?
18 A. Correct.
19 Q. All right. Did you ever see the
20 dog in the store that day where he was not
21 immediately next to or with his owner or
22 handler, the gentleman who brought him into the
23 store?
24 A. No. He kept him pretty close
25 because he liked to jump. He was pretty

12 (Pages 42 - 45)

Page 46

1 rambunctious as a puppy, so he kept him pretty
2 close to him.
3     Q.   Okay.  So you think the dog was a
4 puppy?
5     A.   Yeah.  I don't think he was very
6 old.  Maybe a year.
7     Q.   Do you have any idea what type of
8 dog it was?
9     A.   It could have been maybe an
10 American Bulldog, Pit Bull.  I'm not sure.
11    Q.   Okay.
12    A.   They all kind of look the same.  I
13 mean, the labs, they all have the floppy ears.
14    Q.   Did you get the impression this is
15 some type of a mixed breed dog?
16    A.   Probably.
17    Q.   Okay.
18    A.   His name was Capone, I believe.
19    Q.   Capone?
20    A.   Yeah.
21    Q.   Okay.
22    A.   I can't tell you anything about the
23 guy.  I don't remember him, but the dog, I do.
24    Q.   You think it's Capone, like Al
25 Capone?

Page 47

1     A.   Yeah.  I'm pretty sure that was his
2 name.
3     Q.   Okay.  Do you recall possibly the
4 dog owner calling him that?
5     A.   Yeah.
6     Q.   Okay.
7     A.   I believe so.  That's what stuck.
8 I'm pretty sure that was his name.  Like I
9 said, he was in there quite a few times.  Like
10 five or six at least.
11    Q.   Okay.  Fair enough?
12    A.   And he would always -- like, before
13 anybody would go to pet him he would make him
14 sit.  Then, you could walk up to the dog.
15    Q.   Okay.  Do you think that any other
16 Lowe's employee knew the owner of this dog?
17    A.   Not that I'm aware of.
18    Q.   Okay.
19    A.   It's possible, but not that I'm
20 aware of.
21    Q.   When you say it's possible, I mean,
22 are you just saying because in the world of
23 possibilities it's possible or did someone
24 interact with him in a way that made you think
25 that possibly he may know him personally?

Page 48

1     A.   No.  You never know who knows who.
2 It's a small world and Brimfield is pretty
3 small.
4     Q.   Sure.  Sure.  Do you recall some of
5 the folks that were working on March 18, 2018,
6 when Mrs. Mosholder would have been in the
7 store that morning?
8     A.   I mean, there was quite a few of
9 us.  I know Colin pet the dog.  I don't even
10 think he's at Lowe's anymore either.  But as
11 far as like interacting with him, I'm not sure.
12    Q.   Okay.
13    A.   He just kind of pet him as he was
14 walking through the morning meeting.  But not
15 the owner.  Like, never -- I mean, we were in
16 the middle of a meeting, so --
17    Q.   Okay.  Why don't we try to go
18 through -- as best you can, try to give me the
19 names of the people that you remember being at
20 work that day.
21    A.   Okay.  I mean, as far as my
22 department, we were always the same.  So in my
23 department, Steve was there.
24    Q.   What's Steve's last name?
25    A.   Houser.

Page 49

1     Q.   Okay.
2     A.   Mikey Debolds, Scottie Satterfield,
3 Colin Fitzpatrick.  Other than that, the
4 managers -- I don't even know which managers
5 were there for the morning meeting.  Chad.
6     Q.   Chad was there?
7     A.   I believe he was there for the
8 morning meeting.
9     Q.   Do you recall anyone else being in
10 the store that day that was working with you?
11    A.   No.  I mean, that's just my
12 department.  I kind of stay -- stayed down
13 there.
14    Q.   Sure.  Now, you said that morning
15 meeting took place in the spray paint
16 department, correct?
17    A.   Yeah.  At the regular paint desk.
18    Q.   Were the paint guys hanging around
19 at that time?
20    A.   The whole store goes to the morning
21 meeting.
22    Q.   Okay.
23    A.   Unless you're on register.
24    Q.   So other than the folks you've
25 already mentioned, who else do you think

Page 50

1 might be -- do you remember being there for
2 that morning meeting?
3      A.   Honestly, I'm not sure.
4      Q.   Okay.  All right.
5      A.   I kind of sit in the back and just
6 sit out of the way, but made my appearance
7 because we had to go.
8      Q.   When Mrs. Mosholder -- well, let me
9 back that up a second.  After you left the
10 spray paint aisle you went to the morning
11 meeting?
12      A.   Correct.
13      Q.   After the morning meeting, what did
14 you do?
15      A.   Went back to my department.
16      Q.   At this point in time you were in
17 that sales associate position, correct?
18      A.   Yes.
19      Q.   So you weren't going back to a cash
20 register?
21      A.   No.  I went back to ProService.
22      Q.   All right.  Did you see
23 Mrs. Mosholder in the store after that on that
24 same date, but after the time she interacted
25 with the dog?

Page 51

1      A.   Yeah.  She checked out at register
2 2.
3      Q.   Did you see her check out at
4 register 2?
5      A.   I'm not sure.  I can't be 100
6 percent -- she was there almost every day.
7      Q.   So let me ask you this.  How do you
8 know she checked out at register 2?
9      A.   That's where she always checked
10 out.  She never went to a different register.
11      Q.   But you did not see her actually
12 check out?
13      A.   Correct.
14      Q.   Okay.
15      A.   She always checked out between
16 register 1 and 2, which are the ProService
17 registers.  Because she always parked
18 underneath the awning on the ProService side.
19      Q.   Okay.  Do you remember who would
20 have been at the cash register at aisle 1 and
21 2 -- checkout register 1 and 2 that day?
22      A.   It would have either been Courtney
23 or -- I can't remember the other lady's name.
24 Christy.  Those were our two -- they switch on
25 and off for day and night.

Page 52

1      Q.   Do you know Courtney and Chrissy's
2 last name?
3      A.   I can look on my phone and get
4 them.
5      Q.   I'm fine with that if --
6           MR. EOFF:  Counsel, she wants to
7 look at her phone to get a couple of last
8 names.
9           MR. RESETAR:  Yeah.  Do you want to
10 go off the record for a second?
11           MR. EOFF:  Sure.  Let's go off the
12 record.
13           (Off the record.)
14 BY MR. EOFF:
15      Q.   So Stacie, while we were off the
16 record Mr. Resetar and I were showing you some
17 video footage from the surveillance cameras in
18 the store, the Brimfield Lowe's, on March 15,
19 2018.  One of those videos was of my client,
20 Krystal Mosholder, going through checkout
21 register 2?
22      A.   Correct.
23      Q.   Who was the woman who was the
24 cashier when Mrs. Mosholder was checking out at
25 register 2 that day?

Page 53

1      A.   From the looks of it, it was
2 Courtney.
3      Q.   Okay.  What's her last name?
4      A.   Wide.
5      Q.   Okay.  And we also showed you a
6 video of what we believe to be the owner of the
7 dog in question going through checkout register
8 number 11.  You saw that video as well,
9 correct?
10      A.   Correct.
11      Q.   Do you recall or -- to the best of
12 your belief and knowledge, who did you think
13 was the cashier that was working at register 11
14 when the dog owner went through?
15      A.   Her name is Sherry.
16      Q.   Do you know her last name?
17      A.   I don't.
18      Q.   Okay.  Fair enough.
19      A.   She left before I did.  She doesn't
20 work there anymore.
21      Q.   Okay.  Fair enough.  Well, Stacie,
22 I do generally appreciate you taking the time
23 to come down here.  I know that downtown Akron
24 is a mess right now with construction and I
25 appreciate you not giving up on us and getting

14 (Pages 50 - 53)

Page 54

1 here. I appreciate you taking the time to
2 answer my questions today.
3     A.   Okay.
4     Q.   Mr. Resetar has some things that he
5 needs to tell you, so I'm going to turn this
6 over to him to do that. As far as I'm
7 concerned, that would conclude your deposition.
8     A.   Okay. Thank you.
9         MR. RESETAR: Stacie, you have the
10 right to read your deposition before you sign
11 it to make sure that it's accurate. You don't
12 have the ability to change your testimony, just
13 to make sure that it's all taken down
14 correctly. That is your right to do that. I
15 don't think you need to. If you want to
16 though, go ahead. Otherwise, you can waive
17 your signature. It's up to you.
18         THE WITNESS: I can waive it.
19         MR. RESETAR: Okay. That's all.
20 Thanks, Stacie.
21     (The deposition concluded at 2:06 p.m.)
22
23
24
25

Page 55

1 Whereupon, counsel was requested to give
2 instruction regarding the witness's review of
3 the transcript pursuant to the Civil Rules.
4
5         SIGNATURE:
6 It was agreed by and between counsel and the
7 parties that the reading and signing of the
8 transcript of said deposition, be and the same
9 is hereby waived.
10
11         TRANSCRIPT DELIVERY:
12 Counsel was requested to give instruction
13 regarding delivery date of transcript.
14     Mr. Eoff: Original.
15
16
17
18
19
20
21
22
23
24
25

Page 56

1         REPORTER'S CERTIFICATE
2 The State of Ohio,   )
3             SS:
4 County of Cuyahoga.  )
5
6     I, Ashanti Edwards, a Notary Public
7 within and for the State of Ohio, duly
8 commissioned and qualified, do hereby certify
9 that the within named witness, STACIE WILLIAMS,
10 was by me first duly sworn to testify the
11 truth, the whole truth and nothing but the
12 truth in the cause aforesaid; that the
13 testimony then given by the above-referenced
14 witness was by me reduced to stenotypy in the
15 presence of said witness; afterwards
16 transcribed, and that the foregoing is a true
17 and correct transcription of the testimony so
18 given by the above-referenced witness.
19     I do further certify that this
20 deposition was taken at the time and place in
21 the foregoing caption specified and was
22 completed without adjournment.
23
24
25

Page 57

1         I do further certify that I am not
2 a relative, counsel or attorney for either
3 party, or otherwise interested in the event of
4 this action.
5         IN WITNESS WHEREOF, I have hereunto
6 set my hand and affixed my seal of office at
7 Cleveland, Ohio, on this _____ day of
8 _____, 2019.
9
10
11
12
13
14     Ashanti Edwards, Notary Public
15     within and for the State of Ohio
16
17 My commission expires October 14, 2022.
18
19
20
21
22
23
24
25

15 (Pages 54 - 57)

| & |
| --- |
| **&**  1:20 2:4,14 |

| **1** |
| --- |
| **1**  4:3 25:15,19,24 26:7,20 31:25 51:16,20,21 |
| **100**  51:5 |
| **11**  8:10 53:8,13 |
| **1325**  5:21 |
| **14**  57:17 |
| **15**  52:18 |
| **15th**  21:6 24:1 26:10 45:15 |
| **16**  11:11 |
| **18**  48:5 |
| **1:15**  1:19 |

| **2** |
| --- |
| **2**  3:3 4:4 37:6,8,13 41:17 51:2,4,8,16 51:21,21 52:21,25 |
| **2005**  9:23 |
| **2016**  11:11 |
| **2018**  21:6 24:1 26:10 45:15 48:5 52:19 |
| **2019**  1:18 57:8 |
| **2022**  57:17 |
| **218**  11:3 |
| **2216**  57:13 |
| **222**  1:21 2:16 |
| **25**  1:18 4:3 |
| **2:06**  54:21 |

| **3** |
| --- |
| **3**  4:5 39:19 40:5 41:18,25 45:6 |
| **310**  8:6 |
| **330**  2:18 |
| **37**  4:4 |
| **39**  4:5 |

| **4** |
| --- |
| **4**  3:5 |
| **40**  10:3 |
| **400**  1:21 2:8,16 |
| **44266**  8:7 |
| **44308**  2:17 |
| **44720**  2:9 |

| **5** |
| --- |
| **5**  3:8 |
| **50**  22:21 |
| **56**  3:10 |
| **5:18**  5:21 |
| **5:18cv1325**  1:9 |

| **6** |
| --- |
| **60**  22:21 |

| **8** |
| --- |
| **8040**  2:8 |
| **849-6791**  2:18 |

| **a** |
| --- |
| **ability**  43:21 54:12 |
| **able**  24:25 30:4 31:9 |
| **absolutely**  35:6,14 |
| **access**  16:9 |
| **accommodate**  7:19 |
| **account**  12:15 |
| **accounts**  12:14 15:22 |
| **accurate**  27:14 41:3 42:2 54:11 |
| **acting**  43:9 |
| **action**  57:4 |
| **ada**  42:6,10 |
| **additional**  14:7 42:8 |
| **address**  8:5,9 11:2 43:13,21 |

**adjournment** 56:22
**adults** 9:10
**affixed** 57:6
**aforesaid** 56:12
**age** 5:1
**aggression** 43:2
**aggressive** 23:5 42:22,25 43:9
**ago** 10:19 38:6
**agreed** 55:6
**ahead** 6:5 8:4 18:15 54:16
**aisle** 21:17 24:2,5 24:6,7 25:3,5 26:16,17 29:6,6,8 29:11,14,16,21,22 29:24 31:1 32:7 33:17 50:10 51:20
**aisles** 29:13
**akron** 1:22 2:17 53:23
**al** 1:5,11 5:17,18 46:24
**allowed** 17:12,13 39:2 42:1
**allowing** 38:14
**american** 46:10
**andress** 1:20 2:14
**angry** 23:5
**animal** 37:20 39:13 42:5 44:15 45:9,10
**animals** 19:5,16 23:25 41:25 42:8 44:21
**answer** 7:9,21 54:2
**answered** 41:8
**answering** 7:7

**anybody** 31:7 47:13
**anymore** 35:9 48:10 53:20
**anyway** 34:2 41:14
**anyways** 29:8
**apologize** 40:1
**appearance** 50:6
**appearances** 2:1 3:3
**applications** 14:14
**appreciate** 35:11 53:22,25 54:1
**appropriately** 44:15
**area** 14:5 28:8 30:4
**arm** 19:22
**arrangements** 36:5
**ashanti** 1:25 56:6 57:14
**asked** 32:10,10 33:12 35:4 36:1 36:17
**asking** 7:9 24:21 26:1 43:18 44:5
**asm** 32:19
**aspect** 12:19
**assistant** 8:17 10:10 32:20,21,23
**associate** 12:1,3 15:7,15 50:17
**assume** 13:17 14:11 16:15
**assuming** 15:24 26:25 27:8
**attorney** 57:2
**authority** 14:20,23 15:8

**available** 42:9
43:19
**avenue** 2:8 8:6
**aware** 13:16 47:17
47:20
**awning** 51:18

**b**

**baby** 19:19
**back** 10:13 11:6
13:3 27:3 28:20
41:6 44:6 50:5,9
50:15,19,21
**backed** 20:22
**based** 15:18
**basis** 13:24
**bates** 40:24
**bathroom** 39:11
**behalf** 2:3,12
**belief** 53:12
**believe** 11:9 25:6
26:6 28:1 31:3
42:1 46:18 47:7
49:7 53:6
**best** 7:7 12:5 32:22
48:18 53:11
**bid** 15:19
**big** 18:11,13
**birds** 19:17,20
**bit** 6:21 10:19 28:7
29:11 32:4 37:3
**bite** 27:23 29:2
31:20
**bites** 44:4
**black** 22:16
**blinds** 29:18
**blood** 32:6
**blue** 38:8,12 41:15
**body** 28:3
**bottom** 40:23
**box** 38:8 41:16

**break** 7:15,18,22
**breed** 46:15
**bretton** 2:7
**brief** 18:25
**brimfield** 8:20,22
10:20,23 11:7
20:7 21:9 23:1
38:1 48:2 52:18
**bring** 17:16,20
19:4,17,20 38:14
39:2
**bringing** 17:25
44:2
**brings** 8:23
**brought** 33:16
35:3 44:21 45:22
**building** 12:19
**bull** 46:10
**bulldog** 46:10
**bullet** 42:7 45:7
**bundle** 12:5,6
**business** 12:14
42:9

**c**

**c** 6:7
**call** 10:23 35:4
**called** 5:2 32:3
**calling** 39:25 47:4
**calmly** 45:11
**cameras** 52:17
**cameron** 34:22
**cameron's** 34:23
**campbell** 2:4
**canton** 2:9
**capone** 46:18,19
46:24,25
**caption** 56:21
**card** 14:13,14
**care** 9:10 39:25
**carried** 45:12

**case** 1:9 5:20
**cash** 13:15 20:15
50:19 51:20
**cashier** 11:17,23
12:24 13:5,6 14:9
14:24 15:4,12
52:24 53:13
**cashiers** 14:19,25
**cause** 56:12
**center** 8:15 29:17
30:7
**ceoff** 2:10
**certain** 44:23
**certainly** 23:20
43:20
**certificate** 3:10
10:6 56:1
**certified** 5:4
**certify** 56:8,19
57:1
**chad** 32:13 33:2
33:10,11 34:10
35:21 49:5,6
**chad's** 32:14,18
**chance** 25:25
**change** 54:12
**charge** 12:10
**charged** 12:20
**chat** 44:25
**check** 17:4 51:3,12
**checked** 20:16
33:13 51:1,8,9,15
**checking** 17:5
20:14 52:24
**checkout** 51:21
52:20 53:7
**childers** 34:25
35:2,15
**chrissy's** 52:1
**christy** 51:24

**civil** 5:3 55:3
**classes** 13:8
**clean** 39:10
**cleaned** 39:13
**cleveland** 2:8 57:7
**client** 52:19
**clients** 9:15 17:4
**close** 9:1 31:8
45:24 46:2
**colin** 48:9 49:3
**college** 10:5
**color** 21:21
**come** 12:7 18:20
19:18 20:20,23
31:22 34:4 36:2
53:23
**comes** 33:10
**comfortable** 43:17
43:18
**coming** 25:4 36:24
**commission** 57:17
**commissioned**
56:8
**common** 43:8
**commons** 2:7
**companies** 1:11
2:13 5:18 9:14,16
**completed** 56:22
**computer** 13:8
15:18,19 19:1
40:9
**computers** 16:4
**concerned** 54:7
**concerning** 34:16
**conclude** 54:7
**concluded** 54:21
**confidential** 40:18
40:21 41:1
**connects** 33:19
**construction**
53:24

**contact** 12:14 28:3
**contacted** 34:14
**continue** 10:23
**continued** 28:16
　28:23
**contractor** 12:7
**contractors** 12:4
　12:17 15:21
**contracts** 15:20
**control** 45:9
**conversation** 19:7
　19:11 28:17 30:17
　41:4
**copy** 36:23
**correct** 10:20 11:4
　11:5,21 13:18
　14:6,10,13 15:3
　16:18 17:17,18
　20:9 21:10 22:9
　22:14 26:5,7,8,12
　26:13,20,21 28:5
　28:14 29:25 30:1
　30:11 31:12 33:23
　38:11,15 39:3,5,6
　41:11,19 42:3,4
　43:11 45:4,13,17
　45:18 49:16 50:12
　50:17 51:13 52:22
　53:9,10 56:17
**correctly** 11:20
　54:14
**corridor** 29:24
**counsel** 40:13,24
　41:4 52:6 55:1,6
　55:12 57:2
**county** 56:4
**couple** 28:24 52:7
**course** 10:3 15:21
　15:24
**courses** 10:5

**court** 1:1 3:13
　5:19 6:23 7:12
　36:12 40:20
**courtney** 51:22
　52:1 53:2
**cover** 6:17
**craig** 2:6
**credit** 14:13,14
**cross** 29:24
**cs3790601** 1:23
**cuff** 19:24
**current** 8:5 10:9
**currently** 8:11
**custody** 3:12
**customer** 12:18
　13:21 14:3,5,8,22
　15:2 20:8 22:8
　43:14,22
**customers** 12:21
　14:12 30:3 39:1
**cuyahoga** 56:4
**cv** 5:21

**d**

**damage** 27:19
**dangerous** 43:9
**date** 21:5,9 50:24
　55:13
**dates** 11:13
**day** 20:4 21:12
　31:23 40:10 45:20
　48:20 49:10 51:6
　51:21,25 52:25
　57:7
**deal** 12:5
**debolds** 49:2
**defendant** 2:12
**defendants** 1:13
**define** 10:22
**defined** 42:6,11
**definitely** 25:12

**delivery** 55:11,13
**department** 14:8
　14:23 33:2 48:22
　48:23 49:12,16
　50:15
**departments**
　32:24 33:1
**depends** 43:16
**deposed** 5:5 6:8
**deposition** 1:15
　5:9 8:24 10:24
　25:16,19,23 36:7
　36:16 37:8,12
　39:19 40:4,25
　54:7,10,21 55:8
　56:20
**describe** 21:11
　22:15 29:10
**describing** 26:19
**description** 4:2
**designated** 40:18
　40:21
**designation** 40:23
**desk** 13:22 14:3
　49:17
**determine** 43:8
**different** 9:14
　19:16 23:11 51:10
**difficult** 7:12
**direct** 18:4 45:8
**directly** 43:14,22
**disabilities** 9:11
**discuss** 19:15 35:1
　35:15,19 40:25
**discussed** 40:24
**discusses** 38:13
**discussing** 26:11
　26:14
**district** 1:1,2 5:19
　5:20

**division** 1:3 5:20
**document** 40:5,18
　41:1,9
**dog** 17:16 21:18
　21:23 22:4,11,12
　22:15,25 23:5,7,9
　23:11,12,14 24:4,5
　24:8,10,17,20 25:3
　26:15,16,18,24
　27:4,4,13,17,23
　28:3,23,25 29:2
　30:12,17 31:4,7,11
　31:17 33:16,18
　34:7 36:22 37:19
　43:7,8,15 44:2,4,6
　44:14 45:15,20
　46:3,8,15,23 47:4
　47:14,16 48:9
　50:25 53:7,14
**dog's** 24:12 27:12
**dogs** 19:18
**doing** 12:16 43:7
**door** 18:11 37:3,22
　38:1,10
**doors** 18:13
**dots** 33:19
**downtown** 53:23
**duly** 5:4 56:7,10

**e**

**e** 6:7
**earlier** 26:15 37:2
**ears** 46:13
**easier** 10:25
**east** 8:6
**eastern** 1:3 5:20
**education** 9:25
**educational** 10:10
**edwards** 1:25 56:6
　57:14
**either** 16:25 32:7
　48:10 51:22 57:2

else's 39:13
employed 8:11
employee 18:17
  34:4 35:8 43:21
  44:11 47:16
employees 13:12
  14:17 15:8 19:11
  30:3 31:16 33:1
  42:12,16
enforced 42:11
enforcing 42:16
  42:18
entered 40:20
entire 28:16
entrance 37:22
eoff 2:6 3:8 5:7
  21:1,4 40:15 41:3
  52:6,11,14 55:14
esq 2:6,15
essentially 38:8
et 1:5,11 5:17,18
event 7:18 57:3
eventful 21:13
everybody 20:13
  22:23 30:18
evidenced 40:22
examination 3:7
  5:2,6
examples 16:21
  17:25
exhibit 3:12 4:3,4
  4:5 25:15,19,24
  26:7,20 31:25
  37:6,8,13 39:19
  40:5 41:17,18,25
  45:6
exhibits 3:5,13 4:1
expect 43:6
expecting 39:4
expires 57:17

explain 31:10
explained 18:6
extenuous 17:6
extreme 17:24
eyes 42:3

**f**

f 32:16
fact 7:20 20:6
facts 35:20
fair 19:2 32:17,17
  37:1 40:11 47:11
  53:18,21
familiar 19:25
  20:5
far 48:11,21 54:6
fashion 27:17
february 11:9
federal 5:3
fellow 19:11
felt 34:5 43:22
field 14:11
figure 12:9
filed 40:25
filing 41:2
fill 13:23
find 18:8 20:24
  24:25 33:25
fine 30:21,21 36:5
  40:2 52:5
fingers 27:14 28:5
finish 7:7,9
first 5:4 6:3,22
  11:8,15 13:4
  41:24 45:7 56:10
fitzpatrick 49:3
five 23:3 47:10
floor 13:7 15:17
floppy 46:13
folks 15:2 18:20
  44:24 48:5 49:24

following 45:10
follows 5:5
footage 52:17
foregoing 56:16
  56:21
formal 40:3
forward 34:5
found 33:20 41:17
four 31:15
frequent 44:24
frequently 22:9
friendly 17:14
  18:12 37:20,20
front 13:20 14:1,2
  14:5 37:22
full 5:23
further 56:19 57:1

**g**

generally 53:22
gentleman 22:4
  23:12 24:4 26:15
  45:22
gestures 7:3
getting 18:15 35:4
  53:25
give 10:14 12:4
  16:21 36:2 48:18
  55:1,12
given 16:6 17:8,23
  56:13,18
giving 21:19 53:25
go 6:5,12,19 8:1,3
  10:2,13 11:6 13:3
  22:22 28:12 41:20
  42:22 44:23 45:5
  47:13 48:17 50:7
  52:10,11 54:16
goes 22:1 42:7
  49:20
going 6:11,17 7:16
  7:17,25 8:3 12:8

12:10 18:14 25:14
  25:15 29:25 36:11
  37:5,13 38:1,4,19
  41:6,14 50:19
  52:20 53:7 54:5
good 32:4 44:19
governed 42:6
graduate 9:17,20
growling 43:2
guess 13:22 22:24
  23:2
guidelines 42:18
guy 21:17 31:16
  46:23
guys 19:14 24:15
  49:18

**h**

hand 16:3 21:22
  21:25 25:14 27:12
  27:18 28:4,6
  37:13 57:6
handing 39:24
  40:4
handle 12:14 14:9
  24:25 41:1
handler 45:8,12
  45:22
handling 15:20
hanging 49:18
happened 18:19
  31:10 32:8,9
  35:19,22
happens 39:16
happy 7:19 22:22
hard 27:18
harnessed 45:12
head 6:10,14 7:3
  14:24 15:4
headed 30:9
health 9:10

**hear** 31:19
**heeling** 45:11
**held** 13:24 42:20
**help** 6:20 20:22
**helped** 20:24
**hereinafter** 5:4
**hereunto** 57:5
**hey** 18:21
**hi** 44:25
**high** 9:18,21,24
**highland** 8:6
**highlighted** 41:16
**highlighting** 38:8
**hip** 28:8
**hired** 11:15,16
**hmm** 19:21 20:16
  21:7 22:5 24:3,11
  26:4 27:20 37:4
**hold** 12:25
**home** 9:10,14 32:5
**honest** 38:16
**honestly** 16:8 40:7
  41:12 50:3
**honesty** 17:4
**hope** 39:25
**horse** 17:20 18:1
**hospital** 11:10
**hospitals** 8:14,19
**hour** 10:3
**house** 10:12
**houser** 48:25
**huge** 22:18
**husband** 32:3

**i**

**idea** 46:7
**identification**
  25:21 37:10 39:21
**identify** 30:23
**imagine** 38:18
  45:3

**immediately** 45:21
**impression** 30:22
  46:14
**incident** 26:11,18
  26:19 28:22 34:7
  34:17 35:16 45:16
**includes** 15:1
**index** 3:1,5 4:1
**indicate** 31:2 34:5
**indication** 29:2
**information** 35:5
  42:8
**instance** 45:14
**instruction** 55:2
  55:12
**insurance** 10:1
**interact** 47:24
**interacted** 50:24
**interacting** 48:11
**interested** 57:3
**involved** 34:2
**issues** 13:16,17

**j**

**job** 1:23 11:16,25
  12:7,9,12
**jump** 8:4 45:25

**k**

**kent** 11:4
**kept** 45:24 46:1
**kids** 23:8,10
**kind** 12:18 14:3
  16:7 21:23,24
  29:10 36:10 43:1
  43:5 45:2 46:12
  48:13 49:12 50:5
**kindly** 42:21
**kinds** 19:18
**knew** 33:25 36:17
  36:18 47:16

**know** 7:15,19
  10:17 17:2,11
  20:2 22:10 23:16
  23:18 24:24,25
  25:6,9 32:6 33:6
  34:1,23 35:4 36:4
  36:13 38:20 39:10
  43:2 44:23,25
  45:1,1 47:25 48:1
  48:9 49:4 51:8
  52:1 53:16,23
**knowledge** 32:22
  34:3,6,9 53:12
**known** 22:7
**knows** 48:1
**krystal** 1:5 5:17
  19:25 52:20

**l**

**l** 6:1,1
**labs** 46:13
**lady** 26:24
**lady's** 51:23
**language** 38:7
  42:13
**large** 22:18
**larger** 29:24
**law.com** 2:10
**lawful** 5:1
**lead** 31:3
**leash** 22:21 42:19
**leashed** 17:13,22
  39:5 42:20 44:15
  45:12,17
**leave** 18:18
**led** 31:24
**left** 11:18,22 50:9
  53:19
**leg** 28:7
**level** 38:13
**lick** 27:17

**liked** 45:25
**line** 20:12,21,21
**little** 6:21 10:19
  29:11 37:3 38:23
**lived** 8:8
**llc** 2:4
**location** 8:22 9:2,6
  10:18 21:9 23:1
**long** 7:17 8:8,24
  9:12 17:13
**longer** 29:8
**look** 26:1 38:3
  46:12 52:3,7
**looking** 10:14 25:7
  42:25
**looks** 38:9 53:1
**lot** 19:1 22:20
**lowe's** 1:11 2:12
  4:5 5:17 8:20,21
  8:25 9:6,9 10:14
  10:18,20,23 11:2,7
  11:15,18,22 12:9
  12:22 13:1,4 14:2
  16:2,17,22 19:8,12
  19:20 20:7,8 21:9
  21:14 22:8 23:1
  26:10 30:3 34:4
  37:23,24 38:2,13
  39:20 40:13,13,22
  42:1,12,15 43:21
  44:11 47:16 48:10
  52:18
**lpa** 1:20 2:14
**lucky** 22:22
**lying** 39:12

**m**

**m** 2:6 6:1
**main** 1:21 2:16
**making** 12:21 17:4
**man** 11:10

**man's** 23:16
**management**
  14:17,20,23 18:10
  18:16,17,20 19:7
  44:11
**manager** 32:20,21
  33:4,9 34:22
  43:12 44:3
**manager's** 32:23
**managers** 32:2
  43:19 49:4,4
**march** 21:5 24:1
  26:10 45:15 48:5
  52:18
**mark** 37:5
**marked** 4:2 25:15
  25:20 37:9 39:20
  39:24 40:4
**materials** 12:11
**matter** 5:16 40:20
**mean** 17:1,3,16,21
  21:16 22:11,17
  23:8,23 29:8
  36:10,21 41:11
  43:1 46:13 47:21
  48:8,15,21 49:11
**meaning** 27:4
**means** 7:1
**medical** 8:15
**medium** 22:17
**meeting** 12:22
  18:6 28:13 30:10
  30:13,17,25 31:15
  33:25 48:14,16
  49:5,8,15,21 50:2
  50:11,13
**meetings** 30:8
**mentioned** 8:21
  15:23 16:13 22:3
  33:15 49:25

**mess** 53:24
**messing** 21:20
**methods** 45:10
**middle** 26:22
  29:14,19,21 41:21
  48:16
**mikey** 49:2
**mind** 5:22 29:12
**mine** 22:1,18,20
**minute** 18:14
**minutes** 28:12,24
**mixed** 46:15
**moment** 38:6
**morning** 28:13
  30:8,10,13,17,25
  31:15 48:7,14
  49:5,8,14,20 50:2
  50:10,13
**mosholder** 1:5
  5:17 19:25 20:3,7
  21:8 25:4 26:17
  26:25 27:9,24
  28:15,21 29:3
  31:4,8,10 34:7
  45:16 48:6 50:8
  50:23 52:20,24
**mosholder's** 21:13
  28:3
**mouth** 16:15
  27:12
**moving** 27:13

**n**

**name** 5:23,23 6:3
  16:5 22:10 23:17
  32:14 34:24 45:1
  46:18 47:2,8
  48:24 51:23 52:2
  53:3,15,16
**named** 19:25 56:9
**names** 48:19 52:8

**nature** 7:2,4
**need** 7:1,15,18
  12:8,11 30:24
  54:15
**needed** 12:16
  42:11 43:15,23
**needs** 12:22 54:5
**never** 13:24 15:4
  24:19 38:16 39:13
  48:1,15 51:10
**new** 15:15
**nicholas** 2:15 11:3
**night** 51:25
**nights** 36:3
**nipped** 21:24
  27:18
**nipping** 43:2
**nodded** 6:13
**nods** 7:3
**normal** 43:5
**north** 2:9
**northern** 1:2 5:19
**notary** 56:6 57:14
**november** 1:18
**nresetar** 2:19
**number** 4:2 5:20
  53:8
**nursing** 8:17 10:9
**nw** 2:8

**o**

**obviously** 8:22
  17:16
**occasions** 23:11
**october** 57:17
**office** 5:10 57:6
**oh** 11:9 21:23 28:9
  35:14
**ohio** 1:2,22 2:9,17
  5:20 8:7 11:4 56:2
  56:7 57:7,15

**okay** 5:13,16 6:8
  6:11,18,25 7:5,14
  7:23,24 8:3,11 9:5
  9:8,17 10:4,13,17
  10:22 11:1,6,12,14
  11:14,18 12:2,24
  13:3,14,19 14:19
  15:1,6,10,14,23
  16:5,9,13,19 17:8
  17:15,19,23,23,25
  18:3,15 19:2,23,23
  20:2,5,10,25 22:3
  22:12,15,19 23:12
  23:16 24:9,18
  25:2,8,11,14,17
  26:2,3,5,22 27:7
  27:16,21 28:1,10
  28:15,25 29:5,10
  29:23 30:14 31:13
  31:13,18,22 32:17
  32:21 33:19,24
  34:3,10,15,21,23
  35:5,7,10,18,24
  36:19 37:1,1,5,12
  38:5,12,17,17
  39:23 40:11,14
  41:13,20,24 42:5
  43:25 44:18 45:5
  46:3,11,17,21 47:3
  47:6,11,15,18
  48:12,17,21 49:1
  49:22 50:4 51:14
  51:19 53:3,5,18,21
  54:3,8,19
**old** 46:6
**once** 7:13
**online** 15:11,25
**opposed** 40:1
**opposite** 30:7
**order** 40:19

[original - reading]                                                      Page 7

**original** 55:14
**outside** 16:11 44:6
**oversee** 32:25,25
**overseeing** 33:3
**oversees** 14:25
**oversight** 15:7
**owner** 17:22 24:13
  27:2,3 28:11,23,25
  30:15 31:8 45:8
  45:11,21 47:4,16
  48:15 53:6,14
**owners** 39:10

**p**

**p** 2:15
**p.m.** 1:19 54:21
**packages** 12:5,6
**page** 41:21
**paint** 21:17,21
  24:2,5,6,22 25:3,4
  26:16,17 29:6,11
  29:16,17,21 30:7
  33:18 49:15,17,18
  50:10
**pants** 32:5
**parked** 51:17
**part** 28:2
**partially** 12:20
**particular** 12:11
  45:14
**parties** 55:7
**party** 57:3
**payments** 14:14
**pelini** 2:4,10
**pending** 5:18 7:21
**people** 13:10
  17:16 19:4,20
  30:6,24 38:14
  43:17 44:19,20
  48:19
**percent** 51:6

**person** 22:11
  23:13 32:12
**personally** 47:25
**personnel** 19:7
**pet** 4:5 17:9,11,15
  18:1,11,22 19:8,12
  23:9,10 24:7,9
  27:5 31:17 39:20
  40:13 42:10,16,18
  47:13 48:9,13
**pet's** 17:12
**pets** 38:14 39:2
  41:25
**petting** 30:18
**phone** 35:4 52:3,7
**photo** 4:4 37:9
**physical** 45:9
**picking** 21:21
**picture** 37:16,22
  38:1,7
**pictures** 19:21
**pig** 19:19
**pit** 46:10
**place** 28:8 30:5
  31:24 49:15 56:20
**places** 42:9
**plaintiff** 1:7
**plaintiffs** 2:3
**played** 21:24
**playful** 22:17 23:7
**playing** 27:17
**please** 5:22,24
**pocket** 21:19
**point** 31:23 42:7
  45:7 50:16
**policies** 16:17,22
**policy** 4:5 17:9,11
  17:21 18:4,9,22
  19:8,12 38:13
  39:20 40:13 42:16
  42:18 45:6

**portage** 8:14
**portal** 16:1,6
**position** 10:9
  12:25 13:24 15:7
  15:15 16:24 32:18
  50:17
**positions** 13:1
  16:25
**possibilities** 47:23
**possible** 12:5
  47:19,21,23
**possibly** 47:3,25
**post** 9:24
**posture** 43:3
**potential** 13:16
  33:21
**potentially** 31:7
**pounds** 22:21
**prepare** 36:9
**presence** 21:13
  56:15
**pretty** 12:16 17:6
  32:4 44:19 45:24
  45:25 46:1 47:1,8
  48:2
**prevented** 44:5
**prior** 8:18 9:8 25:3
  36:7,15,24 41:1
**privacy** 15:21,24
  16:13,16 17:3
**probably** 7:17
  23:2 27:13 38:9
  39:4 40:8 46:16
**problem** 13:11
**procedure** 5:3
  7:25
**program** 10:6
**projects** 23:24
  24:19
**proprietary** 40:22

**proservice** 12:1,2
  20:17,18 33:5
  50:21 51:16,18
**protective** 40:19
**provide** 35:5
  36:15 39:11
**provided** 5:2
  26:10 34:11 40:12
**public** 56:6 57:14
**pulled** 21:25 27:3
**puppies** 21:23
**puppy** 46:1,4
**purposes** 10:24
  25:20 37:9 39:21
**pursuant** 5:9
  40:18 55:3
**put** 16:14 27:11

**q**

**qualified** 56:8
**question** 7:8,9,21
  7:22 34:8 38:5,20
  41:8,14 45:15
  53:7
**questions** 7:24
  14:12 24:21 26:1
  54:2
**quick** 7:17 25:24
  41:7
**quite** 9:13 47:9
  48:8

**r**

**ralaw.com** 2:19
**rambunctious**
  46:1
**ravenna** 8:7 9:21
**react** 29:1
**read** 25:24,25
  38:16,23 54:10
**reading** 27:14
  55:7

**ready**  26:3
**real**  25:24 41:6
**really**  18:19 22:16
  23:24 24:19 28:6
**reason**  5:13
**reasons**  19:3
**recall**  5:10 11:8,20
  19:6,9,10 21:5,8
  24:15 29:7 30:2
  41:8 44:7,10 47:3
  48:4 49:9 53:11
**receipts**  17:5
**receive**  13:6 15:15
  18:3
**received**  5:10
  13:14 15:11
**receiving**  5:11
**recitation**  41:17
**recognize**  37:15
**record**  5:21 6:6
  21:1,3 40:16
  52:10,12,13,16
**red**  38:8 41:16
**reduced**  56:14
**referenced**  56:13
  56:18
**referencing**  10:19
**referred**  10:19
**referring**  14:1,4
**regarding**  55:2,13
**register**  13:15
  20:15,18,22 49:23
  50:20 51:1,4,8,10
  51:16,20,21 52:21
  52:25 53:7,13
**registers**  20:17
  51:17
**regular**  20:17
  49:17
**related**  15:11

**relationship**  12:19
**relative**  57:2
**remember**  11:13
  16:8 18:25 22:11
  32:15 36:21 46:23
  48:19 50:1 51:19
  51:23
**remembered**
  36:19
**report**  13:13,17
  17:3
**reporter**  3:13 6:23
  7:12
**reporter's**  3:10
  56:1
**represent**  40:11
**representation**
  41:4
**requested**  55:1,12
**require**  10:10
**requirements**
  10:11 42:5,10,17
**resetar**  2:15 6:13
  34:19 35:24 36:14
  40:15,17 52:9,16
  54:4,9,19
**responses**  7:1
**responsibilities**
  14:7,16 32:23
**result**  20:6
**retained**  3:13
**returns**  13:22 14:9
**review**  36:6,15,23
  55:2
**right**  6:11 8:3 13:3
  18:3 20:19 27:12
  33:8 38:10 39:23
  43:20 45:3,19
  50:4,22 53:24
  54:10,14

**roetzel**  1:20 2:14
**room**  15:20 36:12
**roughly**  10:18
**rpr**  1:25
**rules**  5:3 55:3
**run**  13:15

**s**

**s**  6:1,7
**sales**  10:2 12:1,2
  15:6,14 17:7
  50:17
**satterfield**  49:2
**saw**  21:12 23:7
  31:3 35:20 42:2
  53:8
**saying**  37:19 44:25
  47:22
**says**  18:11 27:2,7
  27:16 28:10 38:20
  39:5,8 41:21,25
  42:6,10 45:6,7
**school**  9:18,21,24
  10:2
**scope**  41:22
**scottie**  49:2
**seal**  57:6
**second**  10:15 21:2
  50:9 52:10
**section**  45:6
**see**  6:22 12:15
  26:6 27:5,19,23
  28:4,8 30:4 38:7
  41:21 42:12 43:7
  44:1,14 45:7,19
  50:22 51:3,11
**seeing**  41:9 44:10
**seen**  22:12,25 23:4
  23:21 29:2 31:9
  34:6 40:5
**seminar**  18:5

**sense**  43:8
**sensibilities**  43:6
**sentence**  27:16
**service**  13:22 14:3
  14:5,8,23 15:2
  41:25 42:5,8
**set**  57:6
**shakes**  6:10
**sherry**  53:15
**shift**  14:25 31:21
**shorter**  20:21
**showed**  53:5
**showing**  35:11
  43:1 52:16
**side**  14:4 51:18
**sign**  18:11,13 37:3
  38:9,13 39:1
  41:16 54:10
**signature**  26:7
  54:17 55:5 57:13
**signing**  55:7
**sit**  31:6 47:14 50:5
  50:6
**sitting**  19:22
**situation**  13:9,10
**six**  23:3 47:10
**sized**  22:17
**small**  38:23 48:2,3
**smaller**  22:20
**smell**  21:23 22:1
  26:24 27:13
**software**  16:6
**somebody**  17:2
  39:13 44:2,4
**somewhat**  22:9
  41:7
**sorry**  6:15 30:19
  33:4
**sort**  10:7
**sorts**  13:23 14:14
  17:5 43:3

**sounded** 22:6
**south** 1:21 2:16
**specific** 9:2
**specifically** 37:21
36:6 41:9
**specified** 56:21
**spell** 5:23
**spelling** 6:2
**spirit** 44:22
**spoken** 34:16
**spray** 21:16,20
24:2,5,6,22 25:3,4
26:16,17 29:6,10
29:16,21 33:18
49:15 50:10
**ss** 56:3
**stacie** 1:16 3:7 5:1
5:6,25 8:4 9:17
18:21 19:24 25:23
39:23,25 41:6
52:15 53:21 54:9
54:20 56:9
**stamp** 40:24
**start** 22:6 26:1
**started** 11:8 13:4
**starts** 32:15
**state** 5:22 40:16
56:2,7 57:15
**stated** 28:2
**statement** 4:3
25:20 26:9,20
27:3 28:11 31:24
32:11 34:11 36:20
36:24
**states** 1:1 5:19
39:1
**stay** 49:12
**stayed** 49:12
**staying** 12:20
**stealing** 13:11
17:2

**stenotypy** 56:14
**steve** 48:23
**steve's** 48:24
**sticker** 38:9,12
41:16
**stipulated** 40:19
**stop** 17:19
**stopped** 31:16
**store** 8:23 11:2
16:10,12 17:13,17
20:11,24 22:13,22
23:14,19,21 28:20
29:20,22 32:20,21
32:23 33:9,25
34:13,22 37:23,24
38:14 39:2,14
42:12,16,21,23
43:15 44:16 45:20
45:23 48:7 49:10
49:20 50:23 52:18
**stores** 42:1 44:23
**street** 1:21 2:16
**strictly** 15:11
**stuck** 21:22 47:7
**stuff** 19:18 20:24
29:19 39:12 40:9
**subpoena** 5:9,11
**suggesting** 16:16
**suite** 1:21 2:8,16
**supplies** 12:10
**supposed** 31:20
**sure** 10:16 12:21
17:4 25:10 36:6
36:14,23 37:14
39:17 40:7 41:12
44:22 46:10 47:1
47:8 48:4,4,11
49:14 50:3 51:5
52:11 54:11,13
**surveillance** 52:17

**suspicion** 38:25
**switch** 51:24
**switched** 9:15
**sworn** 5:4 56:10

**t**

**t** 6:7
**take** 6:23 7:2,12
7:22 13:8 15:21
28:8 42:21 43:15
44:6
**taken** 1:20 54:13
56:20
**talk** 18:21 20:10
28:23 30:24 34:10
35:18,25 42:15
**talked** 19:13 20:12
23:22 28:11 32:2
34:19 35:21
**talking** 7:10,13
11:3 24:12,16
27:8 37:2,2 38:6
**technically** 29:20
**tell** 18:19 35:10
37:25 41:15 43:14
46:22 54:5
**terms** 14:17 42:24
**testify** 56:10
**testimony** 26:23
36:2 54:12 56:13
56:17
**thank** 54:8
**thanks** 54:20
**theft** 13:16 17:1
**thing** 7:20 41:24
**things** 6:16,19,22
7:3 13:23 14:15
17:6 19:14 39:9
43:4 54:4
**think** 7:16 22:25
31:7 34:15 35:12
39:7 41:7 43:16

44:24 46:3,5,24
47:15,24 48:10
49:25 53:12 54:15
**three** 31:15
**time** 7:11 9:9
10:14 11:7,25
15:16 23:4 28:16
29:6 31:2,23 44:3
44:7 49:19 50:16
50:24 53:22 54:1
56:20
**times** 20:23 22:24
47:9
**today** 5:8,14 7:25
8:23 10:24 18:21
26:11 31:6 35:11
36:7,9,16,24 54:2
**toilet** 24:25
**told** 27:4 36:3
42:17
**ton** 40:9
**touch** 12:20
**trained** 13:20,25
16:16,23 43:12,13
**training** 9:25
10:12 13:6,7,14
15:10,16,17 16:2,3
17:9,24 18:4,24
40:8 41:10
**transcribed** 56:16
**transcript** 3:1
55:3,8,11,13
**transcription**
56:17
**treat** 21:19
**treats** 21:18
**tried** 17:20
**true** 56:16
**truth** 56:11,11,12
**try** 7:8 35:19
48:17,18

[trying - years]

**trying** 6:23 30:23
**turn** 54:5
**turned** 21:21
27:11
**two** 9:1,3 11:19
20:17 25:2 40:10
42:3 45:12 51:24
**type** 13:5 15:25
16:5 18:5 33:24
46:7,15
**types** 16:22 19:14

**u**

**um** 19:21 20:16
21:7 22:5 24:3,11
26:4 27:20 37:4
**underneath** 51:18
**unfair** 41:13
**unfortunately**
38:22
**unique** 6:2
**united** 1:1 5:19
**university** 8:14,18
**upper** 28:7
**use** 39:11
**usually** 44:20

**v**

**verbal** 7:2
**verbally** 32:10
**versus** 5:17 14:8
**vicious** 44:2
**video** 52:17 53:6,8
**videos** 52:19
**visual** 29:12
**vs** 1:9

**w**

**w** 6:1
**waive** 54:16,18
**waived** 55:9
**walk** 23:9 31:14
43:13 47:14

**walked** 22:1 23:10
25:7,12 26:18
28:12,18,19 30:12
33:18
**walking** 23:18
30:19 43:18 45:11
48:14
**walks** 22:22 28:21
**want** 16:14,14
18:21 25:24 35:10
35:12 40:15 52:9
54:15
**wanted** 19:4
**wants** 27:5 52:6
**way** 11:3 23:5,6
29:1,18 35:10
39:24 43:3,10
47:24 50:6
**we've** 37:12 40:4
**website** 42:10
**weekly** 21:18
**went** 9:15 17:1
24:7,9 26:24
27:17 30:10 36:10
50:10,15,21 51:10
53:14
**whatsoever** 14:20
**whereof** 57:5
**whichever** 20:21
**white** 22:16
**wide** 53:4
**williams** 1:16 2:4
3:7 5:1,6,8,22,25
40:1 56:9
**window** 38:10
40:10
**witness** 6:10 33:22
36:3 54:18 56:9
56:14,15,18 57:5
**witness's** 55:2

**witnessed** 21:15
**woman** 19:25
52:23
**words** 16:14
**work** 6:21 8:13,19
8:24 9:8 12:4
13:21 15:12 19:1
19:4 36:11 48:20
53:20
**worked** 9:5 11:19
20:6 36:3
**working** 8:18 11:7
11:8,23 13:4 48:5
49:10 53:13
**world** 47:22 48:2
**worst** 7:6
**write** 31:24 32:9
32:10
**wrong** 26:5
**wrote** 36:18,18

**y**

**yeah** 10:8 19:13
22:10 23:8,23
24:7 28:24 36:21
39:15 46:5,20
47:1,5 49:17 51:1
52:9
**year** 11:10 46:6
**years** 8:10 9:1,3
9:13 11:19 19:1

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FORINFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

# VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

To Whom it May Concern:

I, Stacie Williams, witnessed a situation that has arose in regards to a dog that was in Lowe's today 03-15-18. I was in aisle 5, with the spray paint, talking to a gentleman with his black and white dog. As I was petting the dog, a lady came into the aisle looking at the spray paint. The dog went to smell the lady, and the owner pulled him back and told the dog "not everyone wants to pet you". She then turned around and put her hand right up to the dogs mouth and said "you probably smell my dog" and was moving her fingers. The dog, in a playing fashion, went to lick her hand and may have nipped her...but not hard enough to do any damage. The owner immediately pulled the dog back and the dog came back up to me and started licking me. She didn't say anything and continued shopping. I talked to the owner for a few more minutes and walked away to go to the morning meeting. The same dog and owner are in here weekly. The dog, in my opinion, shows no sign of aggression and tries to greet everyone who walks by. He's always been friendly and happy in all my experiences with him. If you need anything at all, please let me know!

Sincerely,

Stacie Williams

Stacie Williams

3-15-18



LOWE'S000004

To Whom it May Concern:

I, Stacie Williams, witnessed a situation that has arose in regards to a dog that was in Lowe's today 03-15-18. I was in aisle 5, with the spray paint, talking to a gentleman with his black and white dog. As I was petting the dog, a lady came into the aisle looking at the spray paint. The dog went to smell the lady, and the owner pulled him back and told the dog "not everyone wants to pet you". She then turned around and put her hand right up to the dogs mouth and said "you probably smell my dog"and was moving her fingers. The dog, in a playing fashion, went to lick her hand and may have nipped her...but not hard enough to do any damage. The owner immediately pulled the dog back and the dog came back up to me and started licking me. She didn't say anything and continued shopping. I talked to the owner for a few more minutes and walked away to go to the morning meeting. The same dog and owner are in here weekly. The dog, in my opinion, shows no sign of aggression and tries to greet everyone who walks by. He's always been friendly and happy in all my experiences with him. If you need anything at all, please let me know!

Sincerely,

*Stacie Williams*

Stacie Williams

3-15-18

LOWE'S000004

5820180511009637



Lowe's • Policy

|   Store Operations United States | **Service Animals and Pet Policy** | |
| --- | --- | --- |
| | Loss Prevention | Effective Date: 12/18/2017 |

# Purpose

Lowe's is committed to providing exceptional service to all customers. Over the years, pets have become an integral part of the family unit and may be included in a family's daily activities such as shopping. While Lowe's continues to comply with the Americans with Disabilities Act (ADA) requirements for allowing service animal to accompany its owner/handlers, being a pet friendly store is a way to reinforce Lowe's purpose through the customer's experience in the store.

The Service Animals and Pet Policy covers guidelines for the appropriate interaction and protocols associated with service animals and pets, to ensure a safe and enjoyable shopping environment is mantained for customers and employees.

# Scope

- Service animals and pets are allowed in all Lowe's stores.
- Service animal requirements are defined and governed by the ADA. Additional information on service animals in places of business is also available on the ADA website.
- Pet requirements are defined below and enforced, as needed, by Lowe's store employees.
- An Americans with Disabilities/Pet Friendly sign must be posted on the front entrance doors to support this program. Signage can be re-ordered through Spend Management in the Archway catalog.

# Policy

The care and supervision of service animals and pets is solely the responsibility of its owner/handler. The owner/handler must be in full control of his/her animal at all times, as outlined below:

- The owner/handler must always have direct physical control of the animal by one or both of the following methods. The animal must be:
    1. Heeling/Walking calmly beside the owner/handler
    2. Harnessed, leashed, or carried

- Service animals must follow the same guidelines as stated above, unless this interferes with the service animal's work or if the customer's disability prevents such means. The service animal must be otherwise under the owner/handler's control (ex. - voice control, signals, or other effective measures).

DEPOSITION EXHIBIT 3
Williams 11-25-17

- The animal's behavior must not disrupt other customers or its surroundings in the store. Disruptive behavior includes, but is not limited to, aggression towards other animals or people, jumping on people or surroundings, barking, growling, etc.

- If a service animal or pet has an accident in the store, please provide the customer with the appropriate materials to clean up after the animal. In some cases, customers with a disability may not be able to clean up after the service animal. In these cases employees can assist the customer as needed.

**Excluding a pet or service animal**

Reasons for excluding a pet or service animal include:

- The animal is not under the direct physical control of the owner/handler.
- The animal's behavior is disruptive to its surroundings, other customers, or employees.
- The animal poses a direct threat to the health and safety of others.
- The owner/handler fails to comply with any of her/his responsibilities as detailed in this policy and/or the ADA governed policy.

If an owner/handler is asked to exit the store with his/her service animal or pet, offer the customer the opportunity to return to the store, once the animal has been removed, to make his/her purchase for product or services.

**Interacting with a Service Animal's Handler**

The recommendations below are primarily for service animals but may also apply to pets.

1. Always address the handler, not the animal. Ask the handler your questions. Do not direct questions to the people around the handler.
2. Do not pet any animal without asking first. It can be very dangerous for a service animal's handler if the animal is distracted from doing its job.
3. Do not feed animals. Many – not all – service animals are on strict, healthy diets to extend his/her working life. Animals may also have allergies that you are not aware of. It can break the animal's training if they learn that they get food in a public place.
4. Not all disabilities are visible.
5. Not all service animals are guide animals. They can also be trained for medical alert (for seizures, diabetes, panic attacks, etc.), mobility, guide work, among other things.
6. Not all service dogs are large. They come in all shapes and sizes – from Chihuahuas to Great Danes and every mix in between. Many medical alert dogs are small breeds.
7. If the dog barks, it may not be misbehaving. Make sure the handler is okay before passing judgment; he or she may be in need of assistance, the dog could be alerting to a pending medical condition, or many other things.

Effective Date:     12/18/2017